## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN ROBERT CIAROLLA,          :
SHARON P. HEINNICKEL,          :
AND DAWN LYNN O'CONNOR,        :
 INDIVIDUALLY AND AS           :
EXECUTORS OF THE ESTATE OF     :
JOHN J. CIAROLLA, DECEASED     :
208 SCOTT DRIVE                :
MONROEVILLE, PA 15146          :          No.
                               :
              Plaintiffs       :
      v.                       :
                               :
UNITES STATES OF AMERICA,      :
                               :
              Defendant        :
_____

## COMPLAINT

1.      Plaintiff John Robert Ciarolla is an adult individual and citizen in the

Commonwealth of Pennsylvania and resides at 4114 Cambridge Drive, Irwin, Pa. 15642.

Plaintiff John Robert Ciarolla was the lawful son of decedent, John J. Ciarolla.

2.      Plaintiff Sharon P. Heinnickel is an adult individual residing at 2176 Route 119

in Greensburg, Pa.. 15601.  Plaintiff Sharon P. Heinnickel is the daughter of decedent, John

Ciarolla.

3.      Plaintiff Dawn Lynn O'Connor is an adult individual residing at 106 Silver Lake

Court, Peletier, North Carolina, 28584.  Plaintiff Dawn Lynn O'Connor is the daughter of

decedent John J. Ciarolla.

4.      Defendant United States of America (hereinafter referred to as the "United

States") is the party that maintains the U.S. Department of Veterans Affairs and its divisions and

subdivisions.

5.      The United States Department of Veterans Affairs was established by Congress to administer the healthcare system for the Veterans of the United States of America, which includes health administration of the VA Healthcare System.

6.      The VA Healthcare System, provides medical care to Veterans including medical nursing, surgical and rehabilitative care for eligible veterans who served in the Armed Forces of the United States.

7.      The VA Pittsburgh Healthcare System is a division of the US Department of Veterans Affairs, and provides healthcare to veterans, including but not limited to facilities of the University Drive Campus in Pittsburgh, Pennsylvania and the H.J. Heinz Campus in O'Hara Township, Pennsylvania.

8.      The University Drive Campus in Pittsburgh, Pennsylvania hereinafter referred to as ("VA University Drive") is an acute care facility providing medical, surgical, nursing and critical care.

9.      At all relevant times, the VA University Drive was at all times hereto owned, controlled, operated,  maintained, traded and/or conducted business as a Health System organized as a division of the U.S. Department of Veterans Affairs and was at all times in the control of the government of the United States of America.  As such, the hospital and healthcare facility was organized to provide healthcare utilizing licensed health professionals. Plaintiffs, in part, are asserting a professional liability action against this defendant.

10.     On April 10, 2013, plaintiff served VA Pittsburgh Health System at both its University Drive Campus and H.J. Heinz Campus with an executed Standard From 95 form providing notice to the United States Government of the claims on behalf of the Estate of John J.

-2-

Ciarolla.

11.     On April 15, 2013, a representative from the VA Pittsburgh Health System of both the H.J. Heinz Campus and University Drive Campus signed for the two certified letters accepting service of the claims.

12.     On April 22, 2013, the US Department of Veterans Affairs Office of Regional Counsel acknowledged receipt of the Standard Form 95 Claim Form.

13.     At the request of the Department of Veteran Affairs, on May 31, 2013, Plaintiff provided a detailed letter to the Office of Regional Counsel documenting all claims associated with the Estate of John J. Ciarolla.

14.     On June 25, 2013, Plaintiff provided the Office of Regional Counsel with additional Information including a medical expert's report identifying the breaches of standard of care and other violations by licensed health professionals at the VA University Drive.

## JURISDICTION AND VENUE

15.     This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671.

16.     Over six months have past since the United States Department of Veterans' Affairs acknowledged receipt of the Standard Form 95.

17.     At the time of this filing, the Department of Veterans Affairs has not yet accepted or denied the claims before the filing of this Complaint, all conditions precedent to the Federal Tort Claims Act have been properly met.

18.     Venue is proper within this district under 28 U.S.C. § 1402(b) as the acts complained of occurred in the Western District of Pennsylvania..

19.     The above captioned matter is being brought against the United States of America pursuant to 28 U.S.C. § 2671, *et seq*. (Federal Tort Claims Act), and 28 U.S.C. §1346(b)(1) for money damages, compensation for personal injuries that were caused by the negligence and wrongful acts and omissions of the employees of the United States Government while acting within the course and scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the State of Pennsylvania.

### FACTS

20.     On June 25, 2011, Plaintiffs' decedent, John J. Ciarolla, was admitted to the VA University Drive with an underlying diagnosis of urinary tract infection.

21.     His past medical history included underlying lung disease, mitral valve stenosis, diabetes, dementia, and hip fractures, all while a resident at the VA's H.J. Heinz facility.

22.     Plaintiffs' decedent was noted to have a fever for approximately two to three days and was started on antibiotics including Ciprofloxacin on June 25, 2011.

22.     Due to his persistent fever and presentation of cough and other upper respiratory symptoms, he was presumed to have pneumonia and a urine for legionella antigen was sent to a laboratory  to determine whether Plaintiffs' decedent had legionella-pneumophila infection.

23.     As part of VA University Drive's protocol, on June 27, 2011, Plaintiffs' decedent was given a single dose of Moxifloxacin.  The next day he was also started on a broad spectrum of antibiotics including Vancomycin and Zosyn.  After his single dose of Moxifloxacin, this drug was discontinued.

24.    A urine screening for legionella antigen came back as positive on July 1, 2011.

25.    On July 1, 2011, Plaintiffs' decedent was started on Azithromycin along with Ceftriaxone.

26.    As Decedent's condition continued to deteriorate and with the diagnosis of legionella pneumonia, he was transferred to the intensive care unit and ultimately required ventilation.

27.    Plaintiffs' decedent's antibiotic therapy continued with Ceftriaxone and Azithromycin for several more days.

28.    Plaintiffs' decedent was ultimately diagnosed with Hypoxemic Respiratory failure which Defendant believed was secondary to legionella pneumonia and further complicated by adult respiratory distress syndrome (ARDS).

29.    After thirteen days of high level ventilatory support which included levophed for blood pressure support, plaintiffs' decedent was started on a morphine drip to make him a little more comfortable, ultimately resulting in his expiration on July 18, 2011.

30.    Despite suspicion of having legionella pneumonia, affective treatment with Moxifloxacin was not continued, instead plaintiffs' decedent was treated for hospital acquired pneumonia with Vancomycin and Zosyn directly contrary to VA University Drive's directives to treat all patients with legionella bacteria or with legionella infection with the appropriate antibiotic therapy.

31.    In failing to maintain proper antibiotic therapy to plaintiffs' decedent who was believed to be suffering from a hospital acquired legionella pneumonia, plaintiffs' decedent was caused to be expire on July 18, 2011.

32.     The failure to treat decedent's legionella bacteria infection appropriately increased the risk for complications associated with the diagnosis of legionella pneumonia and the omission of four days of effective treatment for legionella pneumonia in the 83 year old decedent with multiple medical problems led directly to his further complications of respiratory distress, leading to his death.

33.     At all times relevant hereto, the defendant acted by and through its employees, servants, agents and/or ostensible agents including physicians, nurses, fellows, residents as well as all other medical, nursing, radiology and/or staff presently known to this defendant and unknown to plaintiff after reasonable investigation and prior to discovery who were all acting within the course and scope of their employment, servants, agents and/or ostensible agency with the defendant United States of America and all who were involved in the care and treatment of Plaintiffs' Decedent, John J. Ciarolla.

34.     Defendant United States of America is liable for the negligent acts and omissions of its physicians, nurses, fellows, residents, as well as all other medical, nursing, radiology and/or staff presently known to defendant and unknown to plaintiff after reasonable investigation and prior to discovery under the theories of employment, *respondeat superior*, to agency, ostensible agency, right of control and the captain of ship doctrine.

35.     The unidentifiable physicians, nurses, fellows, residents as well as other medical nursing radiology and/or staff who were involved in the care and treatment of Plaintiffs' decedent John J. Ciarolla may or may not be noted in the records of the defendant, particularly the VA University Drive Hospital records.

36.     The failures by defendant as set forth above which ultimately led to the death of Plaintiffs' Decedent, John J. Ciarolla are due solely to the negligence and carelessness of the defendant by and through its employees, servants, agents and/or ostensible agents and was not due to any act and failure to act on the part of Plaintiffs' Decedent John J. Ciarolla.

## COUNT I
## MEDICAL NEGLIGENCE
## PLAINTIFFS V. DEFENDANT UNITED STATES OF AMERICA

37.     Plaintiff incorporates all of the proceeding paragraphs as if same were set forth at length herein.

38.     The negligence and carelessness of Defendant United States of America by and through its employees, servants, agents and/or ostensible agents as set forth above consist of the following:

a.     failing to prescribed and administer the appropriate antibiotics to effectively address decedent's legionella after suspecting that his pneumonia was secondary to legionella;

b.     discontinuing moxifloxacin after suspecting that his pneumonia was secondary to legionella;

c.     failing to continue treatment with appropriate antibiotic therapy to effectively treat legionella;

d.     sending out urine legionella antigen but failing to send it out "Stat";

e.     failing to send out urine for legionella antigen in a timely fashion;

f.     failing to treat legionella infection while waiting results of the urine antigen test;

g.     failing to appropriately treat legionella and therefore, increasing the risk for complications associated with the diagnosis of legionella pneumonia;

h.   allowing four days to pass before effective treatment for legionella pneumonia was implemented, directly resulting in respiratory distress;

i.   Failing to otherwise continue effective treatment for legionella pneumonia;

j.   Failing to timely diagnosis legionella pneumonia;

k.   Failure to perform a timely and thorough history of the Decedent;

l.   Failure to perform a timely and thorough physical examination of the Decedent;

m.   Allowing the worsening of Decedent's condition without appropriate care or treatment;

n.   Causing a delay in the diagnosis and treatment of Decedent's legionella bacteria;

o.   Increasing the risk of harm to the Decedent by causing a delay in the diagnosis in treatment;

p.   failing to timely order a urine legionella antigen test;

q.   failing to timely order a sputum legionella culture; and

r.   failing to timely diagnose Plaintiffs' Decedent with the legionella bacteria.

39.   As a direct and proximate result of the negligence and the carelessness of defendant United States of America, Decedent John J. Cirarolla suffered catastrophic delay in the treatment of his legionella pneumonia resulting in significant respiratory distress, ventilator dependency, respiratory failure and his untimely death on July 18, 2011 and the Estate suffered damages as are more fully set forth below.

WHEREFORE, for the foregoing reasons, Plaintiffs demand judgment against Defendant United States of America in an appropriate amount and that the Plaintiffs be awarded damages and other attorneys fees, costs, and other such relief as this Honorable Court deems just and appropriate.

-8-

## COUNT II
## NEGLIGENCE
## PLAINTIFFS V. UNITED STATES OF AMERICA

40.     Plaintiff incorporates all of the proceeding paragraphs as if same were set forth at length herein.

### LEGIONELLA HISTORY

41.     In 1976, the American Legion was holding its convention in Philadelphia, Pennsylvania when an outbreak of infection caused by bacteria of the genus legionella was recognized.  The outbreak sickened more than 200 people and 34 died.

42.     The subsequent epidemiological and microbiological investigation led to the isolation of the legionella bacteria.

43.     Legionella is known to be present in a variety of circumstances; however, it has a predilection for aquatic environments.  Its characteristics allow it to thrive in the lines of water pipes, especially in large buildings, and particularly at temperatures in the range of 35-46° C (95-115° F).

44.     In humans, legionella usually manifests itself as either a fever, or a serious and potentially fatal infection of the lungs, as seen in pneumonia.  In most, but not all cases, the legionella infection is a result of a person aspirating or inhaling the infected water containing the legionella bacteria.

44.     Since the recognition that the legionella bacteria can flourish in water systems, certain environments have been noted to be particularly susceptible for the growth of legionella bacteria, especially hospitals, and as such, healthcare authorities and the Center for Disease Control

and Prevention (CDC) monitor and report any known outbreak to contain the spread of any epidemic.

45.     It is a known fact that within Pennsylvania, the rates of a legionella infection are highest in the southwest corner of the state, and are particularly high in and around Allegheny County which includes Pittsburgh, which is also the site of a large veterans population and the VA University Drive Campus.

46.     In 1981, the Pittsburgh VA Healthcare System established a Special Pathogens and Clinical Microbiology Laboratory in Pittsburgh to support the clinical work of the VA in determining the presence of legionella bacteria in human isolates, from VA patients and from water samples taken from VA facilities.

47.     Dr. Victor L. Yu was hired by the VA and was assigned as the Chief of Infectious Disease and the head of the Special Pathogens and Clinical Microbiology Lab.  In 1996, he was assigned to head the lab as a Special Clinical Resource in order to expand testing and research of hospitals and public health agencies throughout the county, including non-VA entities, for the purposes of studying legionella bacteria.

48.     Ultimately, the Special Pathogens Lab collected approximately 4,000 isolates which were studied and stored in the lab.

49.     Dr. Yu and his colleague Dr. Janet E. Stout, studied the legionella bacteria and published various articles on the use of rapid diagnostic techniques to determine the presence of legionella in a water system, as well as studied a copper-silver ionization water system to help eradicate legionella from the water distribution systems in hospitals.

50.     In January, 1997, the Allegheny County (Pennsylvania) Health Department, in response to the legionella outbreaks in hospital settings and based on the research that was being conducted by the Special Pathogens Lab, published a directive for identifying, treating and controlling legionella in Allegheny County Health Care Facilities, of which the Pittsburgh VA Hospital was included.

51.     The directive established testing guidelines for culture protocol for environmental sampling for the presence of legionella. Specifically, if the percent of positive cultures was equal to or greater than 30% of the total number sampled, then disinfection of the water distribution system is appropriate.

52.     The directive added that the Task Force which studied the issue recognized the arbitrariness of the 30% figure, but noted that even if the percentage of positive cultures was less than 30%, that the definition of the problem be located.

53.     The directive also noted that even if less than 30% testing was positive, prospective surveillance must be conducted, and testing for patients with nosocomial pneumonia be tested for legionella, as well as ensuring that infection control practitioners work with the patient's physician to ensure that testing and monitoring continue.

54.     The CDC has indicated that there is no acceptable level of legionella.

55.     Early in the decade of the 2000's it appeared promising that the copper-silver ionization units would work well to eradicate legionella, or at least would prohibit the proliferation of legionella in a water system, if the water system was properly maintained.

56.     However, in 2006, the Pittsburgh Veterans Affairs Department decided to close the Special Pathogens and Clinical Microbiology Laboratory, and dispose of the legionella samples that

were maintained in the laboratory.   Unfortunately, certain specimens were improperly or insufficiently labeled and cataloged and then destroyed.

57.     The Pittsburgh Veterans Affairs Department decided that its own maintenance personnel would be able to maintain, test and address the copper-silver ionization and water treatment system at the VA University Drive Campus, as well as control the risk of legionella disease in the water system.

58.     By August of 2006, officials at the Pittsburgh VA decided that, while they had advanced the knowledge of legionella, a change in direction was warranted and that the field of infection control should be more directed to the eradication of MRSA (Methicillin-Resistant Staphylococcus Aureus).

59.     The copper-silver ion levels in the water treatment system at the VA University Drive Hospital were not properly controlled and were rarely in the effective range to control legionella.  More importantly, the treatment levels were frequently much higher or lower than the effective range, allowing legionella to grow and fester in the VA University Drive water systems.

## LEGIONELLA AT THE PITTSBURGH VA

60.     While understanding that legionella was still a concern for the hospital, the Pittsburgh VA continued to monitor its systems for legionella bacteria.

61.     On September 21, 2007, the VA Pittsburgh Healthcare System tested samples, and specifically, in the 3A Intensive Care Unit, found that 17 out of 19 samples were positive for legionella.

62.     This finding was followed-up nine months later in June of 2008 when 3 positive tests out of 8 samples in the same intensive care unit tested positive for legionella.

63.   On June 30, 2010, 4 out of 9 samples in the 3A Intensive Care Unit tested positive for legionella.

64.   In the following months of July 2010, 6 out of 16 samples tested positive for legionella.

65.   Upon information and belief, on September 8, 2011, 10 out of 28 samples in Unit 6W, 5E, 5W, 4W, 4E and 3A tested positive for legionella. [it was 13 out of 22 samples]

## VA LEGIONELLA POLICIES

66.   In 2008, the Department of Veterans Affairs published a directive establishing guidelines for the evaluation of legionella risk at the Veterans Hospitals, which was similar to the Allegheny County directive of January 1997.

67.   As part of its policy, the Veterans Health Administration Directive noted that Veterans Hospitals were to test water sites at least annually, and that remedial action for legionella positive environmental samples occurs if "the percentage of positive distal sites is above a 'threshold level' determined by the facility".

68.   The Veterans Health Administration then went on to say that it is recommended that a threshold level of positive distal sites be set at 30%.

69.   The directive continued on that if there is any association of legionella bacteria above the threshold that an action plan must be introduced to, among other things, routinely test all patients at the facility with pneumonia for legionnaire's disease.

70.   Further, the policy noted that if environmental samples are positive for legionella pneumophila serogroup 1, then all patients at the facility with pneumonia are to be tested by urinary antigen test.

-13-

71.     Also, the directive noted that any laboratory confirmed positive results for legionella disease needs to be assessed for epidemiological linkage to the facility.

72.     In addition, in 2009, the Department of Veterans Affairs Veterans Health Administration issued a directive on domestic hot water temperature limits for legionella prevention and scald control.  The directive was issued to provide a policy for establishing domestic hot water temperature to prevent legionnaire's Disease.

73.     Although legionella had been detected in the water supply at the VA University Drive Hospital, directives on using hot water to eradicate legionella from the water supply at the VA were not properly implemented in that legionella continued to fester in the water system for years.

74.     In March of 2011, and again in the spring of 2011, it became a known fact to officials at the Pittsburgh VA that legionella was present in the VA University Drive Hospital water system, and several patients began to get sick and die from the legionella bacteria.

75.     In February 2011 the Pittsburgh VA also changed its Legionella Prevention Control Policy and began to check the voltage and amperage from the copper silver ionization units ionization units weekly instead of daily, as had been the normal course of operation for several decades.

76.     Despite learning that a patient had for the first time contracted legionaires disease at the Pittsburgh VA, the infection control monitoring the system was maintained on a weekly basis and did not return to daily.

77.     In July 2011 after learning of this case, Ali Sonel, the Pittsburgh VA's Chief of Staff, asked Robert Muder, the Pittsburg VA's Chief of Infection Control, if there were any additional cases of legionnaires disease and was informed there were no additional cases when, in fact, plaintiff's decedent was being treated for legionnaires in the VA's University Drive facility.

78.     In an infection prevention team meeting on July 21, 2011 there was finally an acknowledgment that Plaintiff's decedent was being treated for legionella, however, despite recognizing that it might have been hospital-acquired, suggested that the exposure may have occurred outside the hospital when the decedent was on "family leave".

79.     Plaintiff's decedent who was suspected of hospital acquired pneumonia and actually treated for a day for legionnaire's disease was inexplicably denied continued antibiotic therapy until the urine antigen came back positive.

80.      The Ciarolla family members, namely Maureen Ciarolla and Sharon Heinnickel were then provided with testing  supplies to test their water because the defendant United States maintained that the decedent had not been exposed to legionella bacteria at the University Drive facility.

81.     Decedent John J. Ciarolla died on July 18, 2011, just 10 days after Sonel's inquiry.

82.     Rather than reporting the presence of legionella to the appropriate health officials, the officials at the VA University Drive Hospital attempted to control the outbreak on their own.

83.     However, by December of 2011, it was realized by the Pittsburgh VA that it could not control the outbreak on its own, and the Pittsburgh VA called in outside consultants, specifically a company called Liquitech Environmental Systems (hereinafter "Liquitech").

84.     Liquitech conducted an examination of the VA University Drive's water supply and found that the water system was not being properly maintained, and that legionella was present in the VA University Hospital water system.

85.     The employees of Liquitech also noted that the maintenance officials and employees at the VA University Drive Hospital did not know how to properly maintain the water systems to eradicate legionella, and further they were altering the test results to make it appear that the conditions were not as bad as they truly were.

86.     In the spring of 2012, employees of Liquitech reported to their supervisors, who in turn reported to the Pittsburgh VA, that the employees of the VA University Drive Hospital were not properly maintaining the water system, and were not taking the necessary and essential steps to prevent a legionella outbreak in the water system at the hospital.

87.     Over the ensuing months of early 2012, Liquitech performed two (2) separate audits of the VA's water system, and again informed the VA of the deficiencies in the water system.

88.     Liquitech also reported that the plumbers, pipe-fitters and the supervisors who worked on the water system at the VA University Drive Hospital facility, all employees and/or agents of defendant United States of America were not properly trained, and did not know how to properly check, clean or adjust the copper-silver ionization treatment system.

89.     Liquitech's warnings went unheeded.

### LEGIONELLA OUTBREAK

90.     On September 13, 2011, the Chief of Staff of the VA University Drive Hospital, Ali F. Sonel, M.D., sent a memorandum to the medical staff notifying them that legionella had been detected in the VA University Drive hot water supply.

91.     Dr. Sonel, as a precautionary measure, recommended the use of bottled water in areas where patients would be at a high risk of infection.

92.     Because remediation procedures were going to be implemented, Dr. Sonel asked that a legionella urinary antigen for all patients with hospital-acquired pneumonia and a legionella culture for those that were producing sputum be obtained.

93.     In spite of Dr. Sonel's memo, in the three (3) months following the memo, only seven (7) of the seventeen (17) patients in the hospital with suspected hospital-acquired pneumonia were tested for Legionnaire's Disease, allowing ten (10) cases to be unreported.

94.     In 2012, when officials at the Pittsburgh VA knew that there was legionella in the water system, they did not take any extra precautions for the patients at the VA University Drive Hospital. For example, if a patient tested positive for legionnaire's Disease, the infection control staff at the VA University Hospital Drive checked for legionella only in the water in the room where the patient stayed, which is contrary to infectious disease control protocols, and the VA's own protocols on Legionnaire's Disease.

95.     Further, when a patient tested positive for legionella, only urine was tested. Sputum or mucus was not consistently obtained from the patient which prevented the hospital from having a sample to compare in order to determine whether or not the legionella outbreak was from its facility.

96.     Also, in violation of Centers for Disease Control and Prevention guidelines, the Pittsburgh VA staff did not regularly obtain patient sputum or environmental samples for comparison, even after a second "probable" case showed up at the VA University Drive Hospital, again delaying any investigation before it became a full-blown outbreak.

97.     Further, urine antigen tests, the test that the Pittsburgh VA used to determine if a patient had Legionnaire's Disease, were delayed for several days by the VA University Drive Hospital lab staff for "efficiency" reasons; they wanted to wait for a batch of five or more samples to accumulate before testing was performed.

98.     Finally, a request was made of Pittsburgh VA officials by the Chief of Infectious Disease Control at the VA University Drive Hospital to get more testing when the legionella outbreak began; however, the testing was turned down.

## CENTERS FOR DISEASE CONTROL

99.     It was not until the Summer of 2012 that the Pittsburgh VA officially acknowledged increasing incidents of legionella bacteria and pneumonia-related disease in its veteran patient population.  Although it was known that legionella was present at the VA University Drive Hospital, no authorities were contacted.

100.    Yet several more months passed when an outside agency, the Pennsylvania Bureau of Laboratories, contacted the Centers for Disease Control (CDC) Legionella Laboratory on October 5, 2012, to request sub-typing of legionella isolates that were found at the VA Pittsburgh Healthcare System.

101.    On October 29, 2012, the CDC reported that preliminary results indicated a link between two (2) cases of legionnaire's disease, with the onset of illness as of August 25, and August 27, 2012, in the environmental legionella isolate collected from the VA Pittsburgh University Drive Campus.

102.    The CDC then notified the PA Department of Health, who in turn notified the Allegheny County Health Department to investigate.

-18-

103.    On November 2, 2012, the PA Department of Health requested an Epidemic Assistance Investigation (Epi-Aid).

104.    An Epi-Aid investigation was established by the CDC to provide rapid assistance to state and federal agencies, as well as international organizations and ministries of health, with the goal of controlling an epidemic and preventing future epidemics attributable to the same or related cause.

105.    On November 5, 2012, a conference call was held with the CDC, VA Pittsburgh Healthcare System, and others, and in which the CDC informed everyone on the conference call about the results of the clinical testing.

106.    Upon learning of the results from the CDC investigation, the Director of the VA Pittsburgh Healthcare System requested a visit from the CDC.

107.    On November 6, 2012, the CDC sent two (2) epidemic intelligent service officers and one (1) microbiologist to Pittsburgh where they joined the Allegheny County Health Department and the Pennsylvania Department of Health in the investigation of the Pittsburgh VA Hospitals.

108.    On November 7, 2012, the investigation began when epidemic intelligence service officers visited the Oakland Campus to identify local cases of Legionnaire's Disease among patients at the VA University Drive Hospital, complete an environmental assessment of Legionnaire's Disease risks, take environmental sampling at the hospital and recommend interventions.

109.    Upon information and belief of Plaintiff's sometime on or about November, 2012, The Center for Disease Control concluded that plaintiff's decedent's death amongst several other deaths was as a result of legionella poisoning contracted while he was a patient at the VA Hospital.

110.   On November 7, 2012, the Epi-Aid team arrived to legally inspect healthcare facilities, including the VA University Drive Hospital, to determine possible sources of aerosolized water, which included patient care areas, waiting areas, decorative fountains and cooling towers. In addition the Epi-Aid team inspected potable water systems, visually inspected the instantaneous hot water heaters and distribution systems, and the three copper-silver ionization flow cells and controllers.

111.   The Epi-Aid team also spoke with the staff concerning maintenance, and reviewed maintenance logs, a consultant report (presumably from Liquitech), and the legionella specific culture results.

112.   Twenty-nine (29) of Forty-Four (44) environmental samples collected by the Epi-Aid field team in November showed growth of legionella indicating wide-spread legionella colonization throughout the hospital.  In addition, clinical legionella isolates from three (3) cases were identical and matched environmental isolates collected from multiple locations in the hospital's potable water system, which strain of legionella was the outbreak strain.

113.   The Epi-Aid team found that despite the copper-silver ionization system and intermittent superheating during the past two (2) years, maintenance was not properly followed which allowed a persistent, highly pathogenic strain of legionella to be present in the potable water system.

114.   The CDC, reporting on the Epi-Aid investigation, noted that the VA Hospital had relied upon a legionella threshold which was too high for preventing outbreaks.  The CDC also recorded that there was extensive construction ongoing at the facility which was not accounted for in the maintenance of the water system during the outbreak.

115.    The investigation concluded on November 16, 2012 when the last member of the field team left Pittsburgh, and initial recommendations were made to stop disease transmission to minimize patient exposure to critical water sources and for short-term systematic potable water system remediation.

116.    The CDC also recommended enhanced testing and surveillance for legionella disease to identify any new cases in the Pittsburgh VA system.

117.    The negligence and carelessness of Defendant United States of America by and through its employees, servants, agents and/or ostensible agents as set forth above consist of the following:

a.    failing to maintain its water system at the VA University Drive Hospital to allow the legionella bacteria to grow to epidemic proportions;

b.    failing to properly teach, instruct and monitor the employees of the VA University Drive Hospital in how to maintain the water system;

c.    failing to have adequate management of the special water treatment to system intended to keep the deadly legionella bacteria from thriving;

d.    failing to correct the problems and to understand the phrase "heat and flush" to eradicate the legionella bacteria from the water system at the VA University Drive Hospital;

e.    failing to hyper-chlorinate the water system during potential eradication of the legionella bacteria from the water system at the VA University Drive Hospital;

f.    failing to hire the appropriate facilities manager with the proper education and understanding of water facilities and water treatment system wherein the legionella bacteria can thrive;

g.    failing to test for legionnaire's Disease in all patients believed to have contracted pneumonia while hospitalized as required by the

2008 guidelines issued by the Veterans Health Administration;

h.      failing to follow the CDC recommendations after the Epi-Aid team
        had been present to check all patients for potential legionella disease;

i.      failing to communicate between facilities management and
        infection control to understand the legionella outbreak and eradication
        efforts;

j.      failing to protect the patients in the VA Hospital when they were
        aware that legionella was present in the water system;

l.      reporting inaccurate ionized levels for legionella control to persist,
        allowing legionella to flourish in the water system;

m.      failing to maintain the copper-silver ionization at the VA;

n.      altering the test results from the monitoring of the copper-silver
        ionization system;

o.      failing to have anyone from the facilities management team
        actively aware or belonging to the infection control team;

p.      failing to test patients for legionnaire's disease when an active
        epidemic outbreak  was known in the hospital system;

q.      failing to test all outlets, and only selecting and testing certain outlets,
        to determine whether or not legionella was present in the hospital;

r.      failing to control the ion levels in the copper-silver ionization system
        which allowed legionella to persist in the water system;

s.      failing to bring in outside consultants and experts who had knowledge
        of legionnaire's disease;

t.      allowing John Ciarolla to be exposed to legionnaire's disease in the
        VA Hospital;

u.      allowing John Ciarolla to be exposed to legionnaire's disease in
        the VA Hospital when it was known that there was an epidemic in
        the VA hospital;

-22-

v.      failing to timely test Plaintiff's Decedent for a legionella infection
while knowing that an active outbreak of legionella bacteria was
occurring in its facility;

w.      failing to inform Plaintiff's Decedent and his family that legionella
bacteria had been discovered in the water purification system at the facility;

x.      failing to  protect Plaintiff's Decedent from Legionella bacteria exposure;

y.      failing to monitor and test those patients in the hospital in June 2011
to determine whether or not they were either susceptible or had the
legionnaire's disease before it became deadly;

118.    The negligence and carelessness of the Defendant, as described herein, was the legal

cause of the decedents' death and Plaintiffs' damages as described more fully below.

119.    The negligence and carelessness of the Defendant, as described herein, increased the

risk that the Plaintiffs' decedent would suffer the injuries and damages as described herein.

120.    As a direct and proximate result of the negligence of carelessness the Defendant, as

described herein, the Plaintiffs' decedent suffered fatal injuries and the Defendant is liable to the

Plaintiffs and the decedent's Estate for damages as set forth more fully below.

121.    As a result of the carelessness and negligence of the defendant as set forth

above, the decedent and the Estate of John J. Ciarolla was caused to suffer damages as set forth

more fully below.

WHEREFORE, for the foregoing reasons, Plaintiffs demand judgment against  Defendant

United States of America in an appropriate amount and that the Plaintiffs be awarded

damages and other attorneys fees, costs, and other such relief as this Honorable Court deems just

and appropriate.

## COUNT III

## WRONGFUL DEATH

## PLAINTIFFS V. DEFENDANT UNITED STATES OF AMERICA

122.    The foregoing paragraphs are incorporated herein by reference as though the same are set forth herein at length.

123.    Plaintiffs, as the executors of the Estate of John J. Ciarolla, Deceased, bring this action on their behalf and on behalf of the beneficiaries pursuant to the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A. § 8301, seeking all applicable damages allowable under the wrongful death act. John J. Ciarolla left surviving the following persons who are beneficiaries under the Wrongful Death Act;

1.    John Robert Ciarolla, 4114 Cambridge Drive, Irwin, Pa. 15642;

2.    Sharon P. Heinnickel, 2176 Route 119, Greensberg, Pa. 15601

3.    Dawn Lynn O'Connor, 106 Silverlake Court, Peletier, NC  28584

4.    Maureen Ciarolla, 208 Scott Drive, Monroeville, Pa.  15146

5.    Kathleen Neumann, 18 David Dunlap Circle, Toronto, Ontario M3C4C1 Canada

124.    As a result of the negligence and carelessness of the defendant as set forth herein, the Decedent was caused to suffer an untimely death resulting in the entitlement of damages by the above noted beneficiaries under the Wrongful Death Act.

125.    Plaintiffs, as executors claim all administrative expenses recoverable under the Wrongful Death Act, including but not limited to damages for hospital, medical, funeral, and burial expenses and expenses of administration necessitated by injuries causing the death of John J. Ciarolla.

126.    Plaintiffs, individually and on behalf of their other siblings who are all beneficiaries are entitled to collect damages under the Wrongful Death Act having lost and having been deprived of the services and society, companionship, comfort, guidance, protection and consortium of their father, John J. Ciarolla and further claim damages recoverable under the wrongful death act for the loss of services, society, companionship, comfort, guidance, solace, protection and consortium provided by the decedent all of which could have been expected to be provided by their father John J. Ciarolla in the future.

127.    Pursuant to the Wrongful Death Act the Plaintiffs' claim for damages also includes emotional and psychological loss, suffered upon the death of John J. Ciarolla which has been and continues to cause mental anguish, pain and suffering to each of the wrongful death beneficiaries as set forth above.

128.    Pursuant to the Wrongful Death Act, the Plaintiffs claim for damages includes the loss of monetary contributions and support provided by the decedent which could have been expected to be provided by decedent to the beneficiaries in the future, including but not limited to money, gifts, entertainment, and recreation.

WHEREFORE, for the foregoing reasons, Plaintiffs demand judgment against Defendant United States of America in an appropriate amount and that the Plaintiffs be awarded damages allowable under the Wrongful Death Act and other attorneys fees, costs, and other such relief as this Honorable Court deems just and appropriate.

**COUNT IV**
**SURVIVAL ACT**
**PLAINTIFFS V. DEFENDANT UNITED STATES OF AMERICA**

129.    The foregoing paragraphs are incorporated herein by reference as though the same are set forth herein at length.

130.    Plaintiffs, Individually and as the Executors of the Estate of John J. Ciarolla, Deceased bring this action on their behalf and on behalf of the beneficiaries under and by virtue of the Pennsylvania Survival Act 42 Pa. C.S.A. §8302 seeking all applicable damages allowable under the Survival Act.

131.    The persons entitled to recover survival act damages are:

    1.    John Robert Ciarolla
          4114 Cambridge Drive
          Irwin, Pa. 15642

    2.    Sharon P. Heinnickel
          2176 Route 119
          Greensberg, Pa. 15601

    3.    Dawn Lynn O'Connor
          106 Silverlake Court
          Peletier, North Carolina 28584

    4.    Maureen Ciarolla
          208 Scott Drive
          Monroeville, Pa.  15146

    5.    Kathleen Neumann
          18 David Dunlap Circle
          Toronto, Ontario M3C4C1 Canada

132.    As a result of the negligence and careless conduct of the Defendant as set forth herein, the decedent was caused to suffer an untimely death resulting in the entitlement of damages

by the above noted beneficiaries under the survival act.

133.    On behalf of the survival act beneficiaries, Plaintiffs claim damages for the amount of loss earnings of the decedent prior to his death.

134.    On behalf of the survival act beneficiaries, Plaintiffs claim damages for the loss of earnings and economic loss of decedent's estate including but not limited to the decedent's total estimated future earnings less his cost of personal maintenance as a result of his death.

135.    On behalf of the survival act beneficiaries, Plaintiffs claim damages for all losses of income, retirement, veterans benefits, and social security income as a result of decedent's death.

136.    On behalf of the survival act beneficiaries, Plaintiffs claim damages for the mental and physical, pain, suffering, inconvenience, embarrassment, humiliation, scarring, disfigurement, mental anguish, loss of life expectancy and loss of enjoyment of life that the decedent endured prior to his death.

WHEREFORE, for the foregoing reasons, Plaintiffs, Individually, and as Executors of the Estate John J. Ciarolla, Deceased, hereby demand judgment against Defendant United States of America for all damages allowable under the survival act and award  Plaintiffs damages and fees, costs, and such other relief as this Honorable Court deems just and appropriate.

SOLOFF & ZERVANOS, P.C.

BY: _____
John N. Zervanos, Esquire
Pa. ID# 49615
**Email**: jzervanos@lawsz.com
Jeffrey P. Fritz, Esquire
Pa. ID# 78124
**Email**: jfritz@lawsz.com
1525 Locust Street, 8th Floor
Philadelphia, PA 19102
(215)732-2260
**Attorneys for Plaintiffs**

-27-

# V E R I F I C A T I O N

I, John N. Zervanos, Esq., have read Plaintiffs Complaint.  The statements contained therein are true and correct to the best of my personal knowledge, information and belief.

This statement and verification is made subject to the penalties of 18 Pa. C.S.A. Section 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false averments I may be subject to criminal penalties.

_____
John N. Zervanos, Esquire

Dated:   December 6, 2013